UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,              )
                                       )
                    Plaintiff          )
                                       ) No. 1:23-cr-10265-NMG-1
vs.                                    )
                                       )
DAPHNE JENKINS,                        )
                                       )
                    Defendant.         )
                                       )
                                       )
                                       )

BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
SENTENCING

John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts 02210

April 10, 2024
3:03 p.m.

Kristin M. Kelley, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:


          Howard Locker

          Alexandra L. Brazier

          Lindsey Ross

          United States Attorney's Office MA

          1 Courthouse Way

          Suite 9200

          Boston, MA 02210

          617-590-3924

          howard.locker@usdoj.gov

          for Plaintiff.



          Leonard E. Milligan, III

          Milligan Rona Duran & King LLC

          28 State Street

          Ste 802

          Boston, MA 02109

          617-395-9493

          lem@mrdklaw.com

          for Defendant.

P R O C E E D I N G S

THE CLERK:  All rise.

(The Honorable Court entered.)

THE CLERK:  Thank you.  You may be seated.  This Honorable Court is now in session.

This is Criminal Action 23-10265, the United States versus Daphne Jenkins.

Would counsel please introduce themselves for the record.

MR. LOCKER:  Good afternoon, your Honor.  Howard Locker on behalf of the United States.

THE COURT:  Mr. Locker, good afternoon.

MS. BRAZIER:  Good afternoon, your Honor.  Alex Brazier for the United States.

THE COURT:  Ms. Brazier, good afternoon to you.

MS. ROSS:  Good afternoon.  Lindsay Ross for the United States.

THE COURT:  Ms. Ross.

MR. MILLIGAN:  Good afternoon, your Honor.  Leonard Milligan on behalf of Daphne Jenkins, who is on my left.

THE COURT:  Good afternoon to you and good afternoon, Ms. Jenkins.

We have Ms. Monteiro from probation.  Good afternoon to her.

We are here for the sentencing of Miss Daphne Jenkins.

I have received and read the presentence report, the government's memorandum in aid of sentencing, the defendant's Sentencing Memorandum, to which there has been a supplement added adding basically six letters that are submitted in support of the defendant, which I have considered.  Those are all the writings I've received.

Is there anything I haven't mentioned that I should have received?  Mr. Locker?

MR. LOCKER:  No, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  There is a pleading I filed last night, which is also styled as a Sentencing Memorandum.  I left a message for Ms. Lima as well.

THE COURT:  Ms. Lima is out today so you left it with the wrong person.

MR. MILLIGAN:  Indeed.

THE COURT:  You may submit it now and/or discuss it, of course.  It's on the docket.  What is it?

MR. MILLIGAN:  It's a similarly situated defendant with a vastly different outcome in her case.

THE COURT:  We are aware of that case.  I didn't know that was considered a separate document.

MR. MILLIGAN:  On Friday, by the deadline, I submitted my memo.  Last night after learning of Miss Brown's case I submitted --

THE COURT:  The name of the case again is?

MR. MILLIGAN:  United States versus Ashley Brown.

THE COURT:  Yes.  We have considered it.  Thank you.

MR. MILLIGAN:  Thank you, your Honor.  Sorry for the confusion.

THE COURT:  All right.  Now, as I understand it, there are no objections to the presentence report, is that correct?  Mr. Locker?

MR. LOCKER:  Your Honor, no objections.  I did note in our Sentencing Memo that I think there is a typo in paragraph 80 in the amount of restitution where it lists the amount as ending in 761.

THE COURT:  Yes.  There's a nine instead of the six.

MR. LOCKER:  Yes.

THE COURT:  I've got that.  That was just a typo.

MR. MILLIGAN:  Thank you.  The defendant had no objections to the PSR.

THE COURT:  All right.  Then we need to turn to the presentence report where recommendations are made for me by the Probation Officer with respect to the guidelines.  They start on page 7, wherein I am advised that the 2023 Guideline Manual should apply.  That's the most recent manual.

Within that manual, we're dealing with guidelines Section 2X1.1, which deals with conspiracy, and 2B1.1, which is the general fraud and deceit guideline.  The base offense level

is established with reference to the second of those guideline sections and is 6.

Do counsel agree with that recommendation?

MR. LOCKER:  Yes, your Honor.

MR. MILLIGAN:  Yes.

THE COURT:  The Court so finds.

Also, because the medical records and orders were sent to the defendant for her review that she knew to be false, the supplier submitted approximately $7.8 million dollars of claims to Medicare.  The intended loss in this case exceeds 3.5 million and is less than 9.5 million and, therefore, subsection (b)(1)(J) applies and calls for an offense level addition of 18 levels.

Do counsel agree with that recommendation? Mr. Locker?

MR. LOCKER:  Yes, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Yes, your Honor.

THE COURT:  The Court so finds.

Also, the fact that the defendant was convicted of a federal healthcare offense involving a government healthcare program and the loss exceeded one million dollars, an additional two levels are warranted under guideline Section 2B1.1(b)(7).

Do counsel agree with that recommendation?

Mr. Locker?

MR. LOCKER:  Yes, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Yes, your Honor.

THE COURT:  The Court so finds.

Also, because the defendant was a licensed nurse practitioner and abused a position of public trust, guideline Section 3B1.3 calls for an additional two-level increase and, therefore, the adjusted offense level is 28.

Do counsel agree with those recommendations? Mr. Locker?

MR. LOCKER:  Yes, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Yes, your Honor.

THE COURT:  Finally, the Court applies a three-level downward adjustment for the defendant's acceptance of responsibility and also, under the new provision, 4C1.1, finding that the defendant is a zero point offender and, therefore, an additional two-level downward adjustment is warranted, yielding a total offense level of 23.

Do counsel agree with all those calculations? Mr. Locker?

MR. LOCKER:  Yes, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Yes, your Honor.

THE COURT:  The Court so finds.

Turning, first, to the defendant's criminal history, there are no prior convictions and, therefore, the defendant has zero criminal history points and falls in Criminal History Category I.

That means at total offense level 23, Criminal History I, the guideline range in this case is 46 to 57 months.

Do counsel agree with all of those calculations? Mr. Locker?

MR. LOCKER:  Yes, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Yes, your Honor.

THE COURT:  Then I will hear recommendations for sentencing, starting with the government.

MR. LOCKER:  Yes, your Honor.  The government recommends the Court impose a sentence of 34 months imprisonment, with a year of supervised release, and restitution and forfeiture and the special assessment as laid out in the plea agreement.

I'll go through some of the 3553(a) factors that we think are important, but I'm going to be brief as I know the Court's reviewed our Sentencing Memorandum.

With regard to the nature and seriousness of the offense, we do view this as a serious offense.  Ms. Jenkins is a licensed medical provider.  She was entrusted by Medicare to

perform appropriate medical services to Medicare beneficiaries, and she's a gatekeeper to the program to make sure that only legitimate claims are submitted and to make sure that only appropriate care is provided. She disregarded that. She abdicated that in order to make money to sign medical orders without reading them, reviewing them, with information that was false. Your Honor, we view that as very serious. And that's reflected -- this wasn't a one off thing or a two off thing. This happened thousands of times over a year long period in which she was rubber stamping orders. We do view that as very serious.

We view that also in the context of the scheme as a whole. We acknowledge that Ms. Jenkins did not organize the scheme. She had a smaller part than that, but her role was very important because, without her signature, the scheme wasn't happening. DME companies needed signed orders from a medical professional. Without them they couldn't bill. The whole scheme would have stopped, but Ms. Jenkins was happy to do that even for the money that she got paid, which was $20 per order, a small portion of what Medicare paid the durable medical equipment companies that billed the orders but, nevertheless, she was a key participant in the role.

If the Court would like, I have a copy of one of the orders that she signed and just the number of false statements that are in there, statements like she had a patient/provider

relationship with these individuals, that she was performing knee examinations on individuals who she was prescribing knee braces for, that she was diagnosing people with certain conditions, that she had conversations with them.  So, all of that, your Honor, if the Court would like, I'm happy to submit as an additional exhibit.

THE COURT:  I don't need it but you can refer to it.

MR. LOCKER:  I also want to talk about the history and characteristics of the defendant.  We acknowledge that there are things that counsel, in favor of a downward variance, that she has no criminal history, that, as the Court has seen in the letters that were submitted, she's done a lot of good for a number of people.  We also acknowledge that she is taking responsibility for her conduct by pleading guilty, by coming in and acknowledging what she did.

We know there are some factors that cut in the other direction, namely her long experience as a provider that should have made signing orders with things that were not true and prescribing items for patients without knowing who they were or what conditions they really had, that that was wrong and that she should not have done that.  She was educated.  She had the ability to earn an honest living.  She decided not to do that.

In terms of deterrence, I think it's important for general deterrence, particularly as this is a white collar case, although for specific deterrence I think the government

does not believe that Ms. Jenkins would re-offend.

I do want to spend a little bit of time on making sure that there are no unwarranted disparities in the Court sentencing Ms. Jenkins. Although there is a range of sentences that courts have imposed on telemedicine providers like the defendant, they've given significant sentences, including a defendant in Northern District of Texas named Rodney Sosa, who received a sentence, I believe, of 46 months. I believe, the loss was about $1.5 million dollars. There's another doctor in the Western District of Wisconsin named Ravi Murali who got a sentence of about 54 months. A nurse practitioner who went to trial in the Southern District of Georgia named Shirley Beaufils, she got a sentence of 87 months. I believe her loss was over $3 million dollars. There's a nurse practitioner in the Southern District of Florida named Elizabeth Hernandez. Her loss amount was almost $200 million dollars. She received a 20-year sentence. There's a doctor in the District of New Jersey named Kallol Saha, I think he owed $9 million dollars in restitution, he received a 36-month sentence. And there are two nurse practitioners out of Montana, Janae Harper, who got a 12-month sentence with $4.3 million dollars in restitution, and another nurse practitioner, Mark Hill, who owed $5 million dollars in restitution and received a sentence of nine months.

So I think, your Honor, there are a range of sentences, including very serious sentences the courts have

imposed.  So we think that whatever sentence the Court deems is appropriate is not going to create any unwarranted disparity.

And I do want to address Miss Brown's case briefly. There are a few distinguishing factors I think.  First, the conduct is not similar.  Yes, they both worked for Expanion Media, but Miss Jenkins worked for three other telemedicine companies that did the same thing that are separate from the plea agreement that we've entered into with her.  As you know, the owner of Expansion pleaded guilty last week to conspiracy to commit healthcare fraud.  The owner of another company is pending trial next month, including charges relating to healthcare fraud conspiracy.  And the owners of the other two companies pleaded guilty to healthcare fraud relating to the telemedicine scheme and, if my memory is correct, essentially acknowledged their whole company was fraudulent.

Her work with those other three companies was actually greater than the work that she did for Expanion.  That's part of her plea.  She made more money.  She signed many more orders.  So we think that conduct alone is very different from Miss Brown.  Ms. Jenkins' total amount of orthotics that Medicare was billed for orders that we believe she signed was about $24 million dollars, with about $11.4 million dollars paid when you look at the totality of her conduct plus some other orders for genetic testing that she signed, all things that had false statements in them.  So, your Honor, we think

that conduct is very distinguishable from Miss Brown.

I believe Mr. Milligan pointed out that Miss Brown was notified of patient complaints and then stopped working.  Well, Ms. Jenkins was also notified of a patient complaint by the Virginia Department of Health Professions in around December of 2019, but she continued signing orders for braces for a few more months after that.  Again, we think that's another thing that distinguishes her.

In that case, at the time, she told the Department of Health Professions that she didn't believe she had signed that order.  She thinks someone must have used her NPI, but as it turned out, she signed so many orders and didn't keep records of who she was signing orders for that she had actually signed the order for the patient whose relative had complained.  So we think those are all distinguishing factors.

Another major distinguishing factor is the Ashley Brown case was a different U.S. Attorney's Office.  I acknowledge to the Court I participated in a proffer with that prosecution team of Miss Brown because of the overlap in our investigations, but that prosecution team made decisions on how they were going to handle Miss Brown's case.  I didn't have a role in that.  So that's another distinguishing factor.

In short, Miss Brown is not similarly situated.  We don't think the Court should consider that.  We think putting them in the same bucket would be inappropriate.

One other point I'll note is these are nationwide fraudulent schemes.  There's no one way for the U.S. Attorney's Office, one team of prosecutors, to investigate all of the different players.  As a result, different U.S. Attorneys decide they want to investigate with their law enforcement partners different players in the scheme and they make decisions of how they're going to handle those cases based on the facts and circumstances of those individual cases.

So, your Honor, I think, based on all that, the government has tried to be thoughtful in its recommendation.  And based on some of the factors about her role in the scheme relative to others, her background, her acceptance of responsibility, which is very important, the government believes the Court should downwardly vary from the guidelines and impose a sentence of 34 months.

Thank you.

THE COURT:  Thank you, Mr. Locker.

Mr. Milligan?

MR. MILLIGAN:  Thank you very much, your Honor.

Ms. Jenkins is asking this Court to sanction her very serious felony that she acknowledges committing by adding to the cascade of consequences she's already suffered, namely that she's a felon, that she has lost her reputation, that she will lose her license, and she is not asking this Court to pretend that she shouldn't lose some freedom either, what we are

arguing is that a period of supervised release is sufficient, but not more than necessary, to ensure that the purposes of sentencing as outlined under 3553(a) are satisfied.

I just want to take a moment to highlight some of the things that I think speak to Ms. Jenkins' character in a way that is essential when one is considering both the general and specific deterrence questions, which I think might dominate some of our thoughts about the appropriate sentence here.

Ms. Jenkins has lived a remarkable life, a remarkable life. I understand that cuts both ways, that, in fact, her academic success and professional success is the reason she was entrusted by Medicaid and Medicare and the federal healthcare programs. She understands that too. It's why the moment she was made aware of this she acknowledged it, both to the government and ultimately to anybody that's asked, but Ms. Jenkins' achievements are not without -- they weren't laid out before her on the easiest path. She escaped a violent marriage and went on to get her master's. She served in the Iraq war and came home to continue raising her children so they can thrive as the adults, I'm sure you read in your letters, they are today. She has lived a life. She's 65.

On Monday, she was editing her paper for her doctoral program because right now she's studying, and her thesis is about, her dissertation is about how she can bring more awareness of the epidemic of undiagnosed Hepatitis C, which is

ravishing people's internal organs, particularly their livers, and that is especially acute in the opioid addicted community where she currently serves in helping to ameliorate that massive epidemic.  That's what she does now despite knowing that today she was going to be here for this.  She's still that future focused.  She's still that focused on help.  She's still actively trying to imagine ways to improve her community.

As wonderful as her war service and her education and her contributions as a medical professional have been, it's most remarkable what a family member she is.  She's the mother, she's the daughter, she's the aunt that everyone deserves but so few people have.  We're not talking about a woman who is merely supported and helps buy the computer for the young woman in her family that wants to get out of retail and work a desk job.  Now she has it because of her decision to encourage her to get further education and for her decision to help her buy a computer.  I'm not talking about that.  I'm talking about somebody who spent 35 years working and at the end of that period of time said, wow, I can't see patients in person anymore, I'm going to have to learn telemedicine and computers and Docusign and I'm going to have to do that because I need to be home to drive my mother to her near daily medical appointments.  I need to be home because I have a suicidal niece who has nobody else to care for her.  And if I abandon that duty, they'll both be institutionalized and that will

become the burden of the state as well.  She didn't let that happen.  And that's the position she was in when she contacted well-known and widely adopted Bartman Associates to seek placements, completely oblivious to the conspiracy she was about to enter.

I was very direct in my pleadings and she's been very direct with the government.  She was wrong.  She rubber stamped those charts when she shouldn't have.  But all the evidence suggests she believed that there were patients who needed that care on the back end and, yeah, if she'd read the charts, she would have known or suspected, at a minimum, that that wasn't there and she should pay a consequence for that.  But putting a 65-year-old woman in a federal prison does not ameliorate the harm she caused.

What does is letting her stay in the community and let her continue to do what she's doing:  Figuring out ways to reduce the impact of the opioid epidemic, figure out ways to limit the catastrophic impact of undiagnosed Hepatitis CS, which is a huge swath of our population.  That's what she's still focused on and that's what she should be doing while on supervised release.  It's the best way to contribute to the healthcare system she defrauded, it's the best way to improve her community, and it's a remarkable opportunity that we have to recognize that as much as the power of incarceration has to deter others from committing horrible conduct, I'd like to

think the optimism and the shiny example she can be would equally be a deterrent to those people who are choosing between making the wrong choice and making the right choice, because for 65 years she's done a fine job of making the right choice and she deserves to be there when her 90-year-old mother, who is going to go into a home if she's incarcerated, and we all know the longevity of a 90-year-old heart failure patient in a nursing home. She's not going to be there when her mother passes after the sacrifices she has made.

I'm asking this Court to give her the dignity that she deserves despite her crime, and that is supervised release. That's $4 million dollars, 90 times her gain, as restitution. That will deter those that would commit this crime out of avarice. That would deter those professionals who would neglect their professional promises, and that's what this Court can be assured if it does here that Ms. Jenkins will make this Court proud.

Thank you.

THE COURT: Does the defendant wish to address the Court before sentence is imposed?

THE DEFENDANT: Yes, your Honor.

Thank you for hearing me. I acknowledge that what I did was wrong. I should not have done it and I own it. I own what I did. And, on reflection, I think back, you know, yeah, I should not have done that, I should not have done that rubber

stamping because it was wrong.  And the ripple effect that it has caused just from that has caused this Court time because now you have to have time to sentence me.  The ripple effect has gone into the CMS system for Medicare and Medicaid and my family.  It caused a ripple effect for my family.  It was wrong.  Even though it wasn't a conscious decision, it was something that I should have known better and I just didn't do it right.

I learned that everybody is not trying to help, that there are schemes out there, and I need to be aware, don't be so naive and believe that everybody wants to help.  I'm no longer working for any type of agencies anymore.  That's no longer an option, but I've also learned that information is something you cannot hold on to.  You have to share it.

This is something that is so wide that if any of my other professional colleagues had opened up and said, this is going on, you need -- this is the scheme, that there's no information, I understand now that what I learned I cannot hold on to.  I need to go out and tell people, there are schemes out there for Medicaid and Medicare and this may be one of them and this is another one.  The communication within my profession, it's just not there.  Somebody needs to be a voice and set something up, whether it's with the nursing boards, if they have a Medicaid or Medicare or a scam section where you can look in and see the scams, or come up with some type of website

or something where professionals can look and see the scams that are going on and even people who aren't.  But the lack of communication and awareness of what is going on is just not out there.

For my part and what was happening here, I acknowledge it and I take full responsibility for it.  At the time I was working outside actually seeing -- I was working at Kaiser's because I love what I do, seeing over a hundred patients a week, but because of the illness of my mother and my niece I had to leave that and try to do this a different way.  I went to an agency that I thought was reputable but it wasn't.  I thought they would vet but they didn't.  I learned I need to do my own vetting.  I can't depend on other people to do something that I need to learn how to do, but I was wrong and I'm very sorry.

I'm sorry for the time I'm taking with this Court, the money that Medicare had to put out for it and anything else that goes along with it and the effect it has on my family. I'm just very sorry for that.

THE COURT:  All right.  Thank you.

Do counsel know of any reason why sentence ought not to be imposed at this time?

MR. LOCKER:  No, your Honor.

MR. MILLIGAN:  No, your Honor.

THE COURT:  Please stand, Ms. Jenkins.

Before I impose sentence, I will respond to your elocution, which is what we call the statement made by a defendant just before he or she is sentenced.  I am encouraged to hear that you are sorry and remorseful.  I don't believe, however, that your decision was not a conscious one.  You had plenty of time and plenty of intelligence to figure out that what you were doing while you were doing it over an extended period of time was dishonest and criminal.  Maybe there was a lack of communication, but that did not interrupt the fact that you knew what you were doing was wrong and was contrary to the trust placed into you by the people at Medicare.

You stand convicted of a serious crime involving fraud on the Medicare system on which hundreds of thousands of our most needy citizens depend to be run honestly and efficiently.  Because of your dishonest conduct as a nurse practitioner, Medicare paid almost $4 million dollars in false claims that should not have been paid even though you apparently received only approximately $44,000 for your role in the fraud.  Nevertheless, the system lost that $4 million dollars that could have gone to needy recipients but for your fraudulent, criminal behavior.  And that program is, as you surely know, in financial jeopardy at least, in part, because of the kind of blatant healthcare fraud in which you consciously and repeatedly participated.

You deserve to go to jail and to serve in-home

detention for a significant period of time, not only to deter you from ever doing this again but also to deter any other healthcare worker who may be tempted to abuse the Medicare system for some extra cash.

If it were not for the extenuating circumstances that have been outlined by your counsel and by you relating to your home situation and your family responsibilities and your age, if it were not for all of that, you would be going to jail for considerably longer, in the neighborhood of four years.

However, pursuant to the Sentencing Reform Act of 1984 and having considered the sentencing factors enumerated in Title 18 of the United States Code Section 3553(a), it is the Judgement of this Court that you, Daphne Jenkins, are hereby committed to the custody of the Bureau of Prisons, to be imprisoned for a term of 18 months.

Upon release from imprisonment, you shall be placed on supervised release for a term of two years, the first 12 months of which shall be served in home detention with electronic monitoring, more fully set forth momentarily.

Within 72 hours of release from custody of the Bureau of Prisons, you shall report in person to the District to which you are released.

It is further ordered that you shall make restitution in the following amount:  To Medicare, $3,952,761.61.  The restitution shall be paid by you, jointly and severally, with

Steven Richardson in connection with Criminal Action 24-10045. Payment of restitution shall begin immediately and shall be made according to the requirements of the Federal Bureau of Prisons Inmate Financial Responsibility Program while you are incarcerated and in accordance with a court-ordered repayment schedule during your term of supervised release.

All restitution payments shall be made to the Clerk of the United States District Court for transfer to the identified victim.  You are to notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of that restitution remains unpaid.

No fine is imposed as it is deemed you do not have the financial ability to pay a fine in addition to restitution.

The Court grants the government's motion for entry of an order of forfeiture in the form of a personal money judgment and orders you to forfeit the sum of $44,020.

While under the Probation Office's supervision, you are to comply with the following terms and conditions:  First, you shall not commit another federal, state, or local crime. You shall not unlawfully possess a controlled substance.  Drug testing conditions are suspended based upon the Court's determination that you pose a low risk of any future substance abuse.  You are to cooperate in the collection of a DNA sample as directed by the Probation Office and you are to comply with

the standard conditions that have been adopted by this Court and are described in the Sentencing Guidelines at Section 5D1.3(c), which will be set forth in detail in the Judgment and Committal.

The following further special conditions apply during your supervised release:  You are to be subject to home detention for a period of 12 months.  You are restricted to your residence at all times except for employment, education, religious services, medical or substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as preapproved by the Probation Officer.  You will be monitored using location monitoring technology at the discretion of the Probation Officer, and you must follow the rules and regulations of that location monitoring program.

You are required to contribute to the costs of the monitoring based upon your ability to pay.

You are to pay the balance of any restitution imposed according to a court-ordered repayment schedule.

You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligation remains outstanding, and you are to provide the Probation Office access to any requested financial information which may be shared with the Asset Recovery Unit of the United States Attorney's Office.

It is further ordered that you shall pay to the United States a Special Assessment of $100, which shall be due and payable immediately.

Ms. Jenkins, you have a right to appeal this sentence. If you choose to appeal, you must do so within 12 months -- within 14 days I mean.  If you cannot afford an attorney, an attorney will be appointed on your behalf.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  It is further ordered that you are to self-surrender to an institution designated by the Bureau of Prisons on Wednesday, May 22, 2024 before 2 p.m.

Are there any further business to come before the Court in these proceedings?  Mr. Locker?

MR. LOCKER:  No, your Honor.

THE COURT:  Mr. Milligan?

MR. MILLIGAN:  Your Honor, may I make one inquiry? The Court had a specific condition of release related to medical appointments.  I would ask the Court contemplate that she also be permitted to leave for purposes of her mother's medical appointments.  Her mother's not able to drive.

THE COURT:  I'll ask the probation officer if she has any objection to that.

PROBATION:  No, your Honor.

THE COURT:  All right.  That will be an additional

condition, her mother's medical appointments.

Is there anything further?

MR. MILLIGAN:  Thank you.  No.

THE COURT:  We're adjourned.

THE CLERK:  All rise.

(The Honorable Court exited.)

(Adjourned, 3:40 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS     )

I, Kristin M. Kelley, certify that the foregoing is a correct transcript from the record of proceedings taken April 10, 2024 in the above-entitled matter to the best of my skill and ability.

/s/ Kristin M. Kelley               June 27, 2024

Kristin M. Kelley, RPR, CRR            Date
Official Court Reporter